THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLAYTON HARBIN, Defendant-Appellant.

(No. 60672;

First District (3rd Division)—August 7, 1975.

Paul Bradley and Brenda E. Richey, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Belle Lind Gordon, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court.

Defendant, Clayton Harbin, was indicted for the murder of Mene Whatley. The jury returned a verdict finding defendant guilty, and the court sentenced him to a term of 15 to 25 years in the penitentiary. Defendant appeals.

The issues raised on appeal are whether the trial court erred in allowing the prosecution to impeach defendant, whether comments by the prosecution during closing argument constituted reversible error, and whether the evidence was insufficient to prove defendant's guilt beyond a reasonable doubt.

At trial the prosecution called Elisha Armstrong who testified that on September 18, 1971, he was working with Whatley at a garage site in Chicago when he saw defendant walk past him carrying a gun at his side. Whatley was working on a garage wall with his back to defendant. The witness saw defendant shove the pistol in Whatley's back, saying "You m----- f-----, I told you I was going to get you." He saw the smoke from the gun and ducked behind the wall. He further testified that he did not see Whatley holding a gun. After the shooting he saw Whatley lying on the ground and there was a short nickel-plated gun lying approximately 2 feet from his body. On cross-examination he stated that he did not remember being asked at the preliminary hearing if he knew who fired the first shot and answering that he did not. On redirect examination the witness stated that he remembered making other statements at the preliminary hearing to the effect that he saw defendant fire the first shot.

Another witness for the State, Leroy Wilson, testified that while working about 24 feet away from Whatley he saw the defendant holding a gun in Whatley's back and heard him say "M----- f-----, I told you I was going to get you." Whatley, with nothing in his hands, turned around, put both hands on defendant's gun and tried to push it down. He started

to fall as the shot was fired, and fell behind a sandpile. Wilson hid behind a wall until the shooting had stopped, then walked out onto an adjoining lawn. Defendant came out of the garage with a gun in his hand and said to Wilson, "Leroy, I told him I was going to get him." Wilson returned to the garage and saw a gun on the ground near the decedent. On cross-examination he stated that he did not recall the question and answer at the preliminary hearing in which he stated that he did not see which gun "it" [purportedly the first shot] came from and that he didn't know the decedent had a gun until it was all over.

Bernard Cass testified for the prosecution that while working near Whatley he heard defendant say "You m----- f-----, I told you I was going to get you," and saw defendant holding a gun in Whatley's back. Whatley turned around and put his hands on the gun. Cass heard a shot, then ran. He further testified that he saw only defendant's gun.

Officer Ed McCabe testified that he found the decedent lying near a wall with a gun about a foot and a half from his hand. He followed the trail of blood which led to defendant's house. Defendant told him he had been shot on 82nd Street near the garage and that his weapon was in the house.

Officer Walter Tiner testified that he followed the trail of blood to defendant, and that while taking defendant and his wife to a nearby hospital he heard defendant say to his wife, "I told the man to quit bothering me."

Officer Harold Huffman testified that upon arriving at the hospital on the date of the occurrence he had a 10-minute conversation with defendant. Returning to the hospital the next morning, he informed defendant of Whatley's death and of defendant's constitutional rights. Defendant told Officer Huffman that he was passing by the construction site and saw Whatley who had been threatening him; that he tried to reason with him, but Whatley pulled a gun and started to fire; and that defendant then pulled out his own gun and returned the fire. Later the same day defendant told Officer Huffman that Whatley had threatened him with a knife 2 weeks earlier.

It was stipulated that decedent's death resulted from a bullet wound in the abdomen and that defendant received three gunshot wounds. Officer Joseph Celovsky of the Chicago Police Department testified as a firearms expert that smoke would emanate from the defendant's gun after it was fired and that the size of the "puff" would be about 10 inches in diameter.

Appearing on behalf of defendant, Billie Jean Space, his sister-in-law, and Van Robert Tyrone Parker, his brother-in-law, testified in substance that in October or November of 1970, while at a party the decedent told

Parker in the presence of Mrs. Space, "You tell Clayton [Harbin] that I am going to kill him when I see him." Parker related the message to defendant's wife the next morning.

Elfredia Harbin, defendant's wife, testified that the decedent called her in August 1971, and said he was going to kill her husband; that he called again about 2 weeks later. She did not tell defendant about the first call but told him of the second one in "late 1971" before the shooting, in which decedent called defendant a "dirty m----- f-----" and threatened to kill him "whenever he saw him." She further testified that defendant left home at noon on September 18, 1971, and returned after he had been shot.

Defendant testified that he had known the decedent for 14 years; that he thought their relationship was very good; that the decedent got him a job and they had worked together for a few years; and that the decedent had been his landlord for 4 years. He stated that on the date of the occurrence he had left his house and returned there twice before noon. Shortly after noon, with his gun concealed, he walked through the area where the decedent had been working, and approached the decedent to talk to him about a personal matter. The decedent reached toward his pants, raised his arm, producing a pistol, and without saying a word fired at defendant, hitting him in the jaw. Defendant turned to run and was hit in the back; he turned and shot at the decedent who had been running very close behind him. Defendant denied placing his gun in the decedent's back.

Defendant further testified that on September 18, 1971, he was taking the pistol to his brother-in-law who lived near 70th and Yates; that earlier in the day he had been closer to his brother-in-law's home. He had decided to return the gun because he had been out of town for a week and arrived home at 3 a.m. that day. He testified that in about the latter part of 1970 or the first part of 1971, Parker had told him about a conversation had the previous evening in which Whatley said he was going to kill defendant. The next time defendant spoke with Whatley was in June or July of 1971 when Whatley threatened to kill him because he had "engineered a thing" between one of his [defendant's] friends and a woman with whom the decedent was having an affair. Defendant next saw Whatley in August of 1971, at which time the latter told a Mr. Witherspoon to ignore the defendant, pulled a knife and tried to "cut" him. Defendant stated that his wife told him in August of 1971, that Whatley had called and threatened to kill him. The next time he saw Whatley was the day of the shooting.

In rebuttal the prosecution recalled Officer Huffman, who testified concerning his first conversation with defendant on September 18, 1971,

in the emergency room of the hospital. Defendant was receiving treatment but was responsive, coherent and not "under medication." He stated that he had been walking home on 82nd Street when he first saw Whatley working at the garage site; that he went home to get his gun and returned; that as he approached Whatley the latter pulled a gun and shot him, and defendant returned the fire.

## I.

We first consider the argument of defendant that the trial court erred in allowing the prosecution to impeach defendant's credibility with a prior inconsistent statement. Upon direct examination Officer Huffman testified that he had a conversation with defendant at the hospital shortly after the shooting. The court then sustained defendant's objection to the substance of the conversation and to statements made by defendant because of the earlier failure to give constitutional warnings as provided in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct 1602. At a side-bar conference defendant moved to exclude any rebuttal testimony of Officer Huffman as to conversations with the defendant on September 18, 1971, on the grounds that *Miranda* prohibits the use thereof; that at the time of the alleged statements defendant was wounded and in the hospital; and that the prosecution had not properly laid any foundation for the introduction of the allegedly inconsistent statement. An offer of proof was made as to what the rebuttal witness would testify to be defendant's statements. The motion was denied and the witness was allowed to testify. The court held that *Miranda* does not prohibit the use of statements made by defendant for impeachment purposes and noted that on cross-examination defendant was asked "several times where he had gone prior to coming up to the scene." Defendant's objection to the testimony was renewed and denied during the rebuttal witness' testimony as to the substance of the conversation.

■■ In *Harris v. New York* (1971), 401 U.S. 222, 225, 28 L.Ed.2d 1, 91 S.Ct. 643, the United States Supreme Court held that a statement by defendant prior to being given his *Miranda* warnings may be used to impeach his credibility. However, in the instant case, defendant contends that no proper foundation was laid by the prosecution for the introduction of the alleged prior inconsistent statement of defendant. In support defendant cites and strongly relies upon the holdings in *People v. Moses* (1957), 11 Ill.2d 84, 142 N.E.2d 1; *People v. Henry* (1970), 47 Ill.2d 312, 265 N.E.2d 876; *People v. Rodgers* (1972), 53 Ill.2d 207, 290 N.E.2d 251; and *People v. Powell* (1973), 53 Ill.2d 465, 292 N.E.2d 409. The cases are consistent in the statement of the general rule:

"Before prior inconsistent statements are offered for impeach-

ment purposes, a foundation must be laid when the witness, whose credibility is challenged, is cross-examined. [Citation.] This rule is designed to protect the witness from unfair surprise and assure him the opportunity to deny or to explain the prior statement. [Citation.]" *People v. Powell*, 53 Ill.2d 465, 473.

In both *Henry* and *Powell* the court found that the party seeking to introduce the impeaching testimony did not follow the conventional and formal standards required for laying the necessary foundation. The court noted in both cases, however, that such failure was not necessarily fatal where there was a sufficient cross-examination to satisfy the reasons for the rule.

In the instant case, through pretrial discovery procedures defendant was furnished with a list which named Huffman as a witness and also specified that defendant had made an oral statement. At trial an offer of proof was made prior to the testimony of the officer, and considerable argument upon the subject was heard. We note, however, that neither in the trial court, nor here on appeal has defendant claimed surprise. No attempt was made by the defense to recall defendant to explain or deny either the substance or the existence of the alleged statement. Notwithstanding these facts, no proper foundation having been laid by the prosecution, it was error for the court to allow the testimony of the officer as to defendant's prior inconsistent statement. Although defendant testified on direct examination that he already had the gun in his possession when he saw Whatley at the construction site for the first time that day, the prosecution failed to inquire on cross-examination whether he had made a statement to the officer on September 18, 1971. A defendant or other witness must be given the opportunity to explain or deny the substance or the existence of the alleged inconsistent statement in the first instance. In a jury trial, the jury's attention must first be directed to the existence of the statement; otherwise, without such a foundation, the jury may be given to speculate that the testimony of the rebuttal witness is substantive rather than impeaching.

■■ In the case before us, although it was error to allow the impeaching testimony over objection of defendant, we hold that the error was harmless and not prejudicial. The prior statement of defendant was inconsistent with his trial testimony only in that he stated to Huffman that he saw Whatley, went home to get his gun, then approached Whatley. The remainder of the statement was consistent with his testimony at trial; that the *deceased* first pulled a gun and fired, and defendant fired in return. More significant, however, is the fact that the trial court gave the jury defendant's instruction No. 1 (IPI—Criminal 3.11) which advised the jury to consider any prior inconsistent statements of witnesses

as affecting only the weight to be given the testimony of that witness. In light of the other substantial evidence of defendant's guilt we cannot say that the error complained of was likely to have affected the decision of the jury, and we hold that the error was harmless. See *People v. Mc-Casle* (1966), 35 Ill.2d 552, 559, 221 N.E.2d 227.

## II.

■■ Defendant's second argument on appeal is that the prosecution's comments made during closing argument to the jury constitute reversible error. Referring to the alleged incident where the deceased threatened defendant with a knife in the presence of a Mr. Witherspoon [who did not testify at trial], the prosecution stated, "The defendant did not tell you that after the man pulled a knife on him that he called the police." The trial court promptly sustained defense's objection. On appeal, defendant argues that the prosecutor "attempted to draw the jury's attention to defendant's failure to call occurrence witnesses in his behalf." We find no such attempt or any inference of such in the above statement. However, even assuming that such an interpretation is conceivable, no prejudicial error resulted in view of the prompt objection and prompt ruling of the court. See *People v. Sawyer* (1969), 42 Ill.2d 294, 300, 251 N.E.2d 230.

■■ The prosecution commented during its closing argument to the jury upon the testimony as to what occurred at the construction site and stated, "He [the defendant] thought it unnecessary or he believed it unwise to call any other persons who were there to support—." The trial court sustained the defense's immediate objection and instructed the jury to disregard the comments. At a side-bar conference the court, in denying defendant's motion for a mistrial, stated that the comment was not of such a magnitude to prejudice defendant's right to a fair trial, and admonished the prosecution not to pursue the subject during further argument. In *People v. Moore* (1972), 9 Ill.App.3d 231, 232, 292 N.E.2d 42, the court reiterated the general rule that the defendant has no duty to call anyone as a witness on his behalf and held that "argument to a jury that comments on the failure of a defendant to call witnesses on his behalf is prejudicial." Although it is improper for the prosecution to comment on the defendant's failure to present witnesses when such witnesses are equally accessible to both parties (*People v. Mays* (1972), 3 Ill.App.3d 512, 514, 277 N.E.2d 547), the prejudicial effect, if any, of these comments upon the jury was removed by the prompt objection by counsel and the trial court's prompt ruling thereon and instruction to the jury to disregard the comments. See *People v. Sawyer.*

■■ During defense's closing argument to the jury, counsel stated that

it was not necessary for defendant to testify. In rebuttal argument the prosecution repeated the defense's comments and added, "Indeed, there was a necessity for the defendant—." Defendant's objection was immediately sustained by the trial court. We note that the prosecution prefaced the objectionable comment by agreeing with defense counsel that the law does not require a defendant to testify in his own behalf. Although defendant invited argument upon this subject—and it has been held that error cannot be predicated upon the response that is produced by invitation or provocation (*People v. Colon* (1973), 9 Ill.App.3d 989, 293 N.E.2d 468)—arguments and statements to the jury during closing argument generally must be based upon the facts appearing in the proof or on legitimate inference deducible therefrom. (See *People v. Halteman* (1956), 10 Ill.2d 74, 139 N.E.2d 286.) Although the prosecutor's comment that there was a necessity for defendant to testify may be construed as an attempt to shift the burden of proof upon him, in the context in which it was said the statement apparently was argument in response to defense counsel's comments. In any case, it would have been better had the comment not been made. The court promptly sustained the defense's objection to the comment and we believe such action effectively prevented any prejudice to the defendant. See *People v. Sawyer.*

All of the above comments of the prosecutor made during closing argument, although improper, were different in nature from each other and were not sufficiently cumulative in effect to constitute prejudicial error. Unlike the facts in *People v. Pepper* (1971), 2 Ill.App.3d 621, 276 N.E.2d 416, the prosecution here, after objections to the comments were sustained, did not persist in pursuing the same argument.

### III.

■■ Defendant's final argument on appeal is that the evidence presented at trial was insufficient to prove defendant's guilt beyond a reasonable doubt. In a jury trial it is the function and duty of the jury to weigh the testimony, judge the credibility of the witnesses and determine factual matters in debatable sets of circumstances. (*People v. Woods* (1963), 26 Ill.2d 582, 585, 187 N.E.2d 692.) The credibility of each witness was determined by the trier of fact. We hold that the facts admit of sufficient evidence to sustain the conviction, and that the evidence is not so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. See *People v. Johnson* (1954), 2 Ill.2d 165, 172, 117 N.E.2d 91; *People v. Jordan* (1960), 18 Ill.2d 489, 492, 122 N.E.2d 209.

We find that there was sufficient evidence from which the trier of fact

could conclude beyond a reasonable doubt that the defendant did not act in self-defense and that he was guilty of committing the offense of murder as charged.

For the above reasons, the judgment is affirmed.

Affirmed.

McGLOON, P. J., and McNAMARA, J., concur.