THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PEARLEY J. HUGHES, Defendant-Appellant.

First District (3rd Division)   No. 61173

Opinion filed March 2, 1977.

Ellis E. Reid, of McCoy, Ming & Black, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Patrick W. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant, Pearley Hughes, was charged by indictment with the murder of John Hall and with aggravated battery against Kevin Law. After a jury trial, defendant was found not guilty on the charge of murder, but guilty of the voluntary manslaughter of John Hall and the aggravated battery against Kevin Law. The trial court entered judgment on this verdict and sentenced defendant to 1 to 4 years in prison. From this judgment the defendant now appeals.

On appeal defendant makes the following contentions: (1) that the trial court erred in denying his motion for acquittal (a) because the prosecution failed to prove beyond a reasonable doubt that the defendant acted without lawful justification, and (b) because the prosecution failed to prove beyond a reasonable doubt that the act of the defendant was the proximate cause of John Hall's death; (2) that the trial court erred in denying defendant's motion for a new trial based on the fact that Dr. Carlos Say, although listed by the prosecution as a prospective witness, was never called and was unavailable to the defendant at the time of trial; (3) that the trial court erred in instructing the jury; and (4) that the trial court erred in refusing defendant's request to make an offer of proof pursuant to a motion to strike the jury panel.

We affirm.

On September 26, 1973, John Hall, Kevin Law and the defendant were working for the J. D. Construction Company installing underground sewers at J. O. Road and Stony Island in Chicago Heights. Hall was employed as the operator of a crane and Law as the oiler of that crane. As oiler, Law both maintained the crane and served as apprentice to Hall. Defendant was employed as a "tag line" man, the worker responsible for keeping the lines of the crane straight and for relaying signals from the workers underground to the operator of the crane.

Called as a witness by the State, Kevin Law testified that during the afternoon of September 26, 1973, as Law was operating the crane, one of the "tag lines" of the crane broke. Although it was his responsibility, defendant was not holding the "tag line" at the time it broke. After untangling the line, Law and the defendant walked toward John Hall who was standing by the operator's cab of the crane. The defendant and Hall began arguing. Hall told the defendant it was his job to hold the line while the machine was operating. At some point, Hall removed his glasses and placed them on the crane. Although there was no physical contact during this argument, Hall did shake his finger at the defendant. The argument ended and Hall replaced his glasses.

Law further testified that after defendant and Hall stopped speaking, defendant took four steps away from Hall, threw off his hard-hat and picked up a four-foot long two-by-four board. The defendant swung at

Hall and hit him on the side of the head causing Hall to stumble backwards and fall to the ground. At this point, Law told Hughes and Hall to "cool down," but Hughes struck Hall again in the shoulder area. Law told Hughes again to stop, but Hughes took a third swing at Hall. Law did not see if or where this third blow landed.

Law went on to testify that after the defendant hit Hall, he turned toward Law and hit him on the side of the head with the two-by-four, fracturing Law's jaw in two places. Law then retreated, picked up a stick of his own and yelled at the defendant from across the street. According to Law, Hall had no weapon, nor did he reach into his pocket during the incident. Law further stated that he never jumped on defendant's back.

John Mack, also called by the State, testified that he was standing in the shaft about 25 feet from the participants at the time of the incident. Although he could not hear what was said, he could tell from their facial expressions that the defendant and Hall were arguing. Mack stated that the defendant took a few steps away from Hall, disappeared from his line of vision due to the sheeting around the shaft, reappeared with a two-by-four, and struck Hall three times, twice about the face and once on the shoulder. Mack further testified that after the defendant hit Hall, Law tried to talk to the defendant to calm him down. The defendant then hit Law. Law never jumped on the defendant, nor did he have any weapon. Mack further stated that he never saw a weapon in Hall's hand.

Mack also testified that after the fight Hall said that he was all right and could continue working. Mack noticed that Law was bleeding profusely and took Law to the hospital.

The next witness called by the State, David McFadden, the labor foreman, testified that he arrived at the end of the incident. At this time, McFadden saw Hall on the ground with nothing in his hands and the defendant standing over Hall holding a two-by-four. Hall was bloody and his nose was scratched. McFadden told the defendant to leave and the defendant responded, "Make them leave me alone." After the defendant walked toward his car, McFadden went over to Hall who said he was all right and returned to operate the crane. McFadden told Hall to drop the bucket of the crane into the shaft to pick up dirt. When Hall failed to raise the bucket, McFadden sent another worker, Jerry Dorsey, up into the crane. Dorsey turned off the crane engine and a truck driver removed Hall from the crane. Dorsey stated at trial that Hall "slid out of his seat" in the cab of the crane.

McFadden went on to testify that the defendant had asked to leave earlier in the day, but did not explain why. McFadden also indicated that he had seen Hall on previous occasions with a knife with a hook blade. However, McFadden did not remember seeing Hall with the knife on the day of the incident.

Another witness called by the State, Archie McEachern, the general superintendent, testified that the defendant came to see him in the office after the incident. McEachern indicated that at this time the defendant told him that he had hit Hall with a "stick" and that he had meant to kill him. McEachern also stated that the defendant never mentioned that Hall first attacked him with a knife. In the office at the time was the project manager, Bruce Boddy, whose testimony at trial corroborated the above testimony of McEachern.

McEachern went on to testify that after talking to the defendant, he went to see Hall and noticed a bruise on Hall's nose and that Hall's lip was swollen. McEachern returned a half hour later and Hall told him he had a severe pain in his chest. An ambulance arrived 10 minutes later and McEachern accompanied Hall to the hospital. Approximately five or six minutes after arriving at the hospital, as McEachern was sitting aside Hall's bed, Hall groaned and the curtains surrounding Hall's bed were pulled.

The next witness called by the State was Kenneth Rewers from the sheriff's police who took a statement from the defendant the day of the incident. Rewers testified that the defendant, after waiving his *Miranda* rights, stated that Hall struck him first and that when Hall reached into his pocket, the defendant picked up a stick and struck Hall because he thought Hall had a knife. The defendant, however, further stated that he did not actually see Hall display a knife. The defendant said he struck Law because Law was jumping on his back. The defendant also told Rewers that Law had a board in his hands when Law was chasing the defendant across the street.

Mary Jean Hall, wife of the deceased, testified that she had been married to the deceased for 24 years and that during that time he never complained of a heart condition. The decedent's wife further stated that her husband had never been treated for a heart condition during their 24 years of marriage; that the decedent drank on weekends; and that he owned a jackknife.

Called as a witness for the defense, Oscar Thigpen, the labor foreman, testified that he was in the trailer with Archie McEachern and Bruce Boddy when the defendant arrived shortly after the incident. The defendant told Thigpen that Hall had hit him first and that defendant then hit Hall with a two-by-four. Thigpen then went to see Hall whose nose and side of the head were bruised. Hall told Thigpen he was all right and did not have to see a doctor.

Testifying in his own behalf, defendant Pearley Hughes stated that in the morning the day of the incident Kevin Law and John Mack had set fire to a bag of sawdust as defendant was sitting atop it and that Law and Mack had put the "tag line" rope around him. Due to this harassment,

defendant requested permission to leave work. Such permission was denied and the defendant continued working.

The defendant went on to testify that later in the day he was told by his supervisor, Archie McEachern, to tell Kevin Law, who was up in the crane, to stop operating the crane. As the defendant was talking to Law, Hall approached and told the defendant that if he did not want to work he should leave the construction site. The defendant then told Hall he was talking to Law, not Hall. Hall then slapped the defendant in the face, the force of the blow knocking defendant's safety helmet and glasses to the ground. As the defendant stooped to retrieve his helmet and glasses, he saw Hall reach into his pocket and move toward him. Believing Hall had a knife, the defendant picked up a two-by-four board and struck Hall knocking him to the ground. The defendant indicated that it was customary for both Hall and Law to carry knives on the construction site.

The defendant further testified that Kevin Law then jumped on his back. After shaking Law from his back, the defendant saw Hall approaching. The defendant then struck Hall again with a two-by-four and also struck Law who by now had also picked up a two-by-four board.

Defendant also testified that he went to the trailer after the incident and talked to Archie McEachern. He did not have a conversation there with either Bruce Boddy or Oscar Thigpen. The defendant stated that he never told McEachern he meant to kill Hall.

Dr. Pascuala Culala, a certified pathologist with the Cook County Coroner, performed an autopsy on the deceased the day of the deceased's death. At trial, Dr. Culala testified that he had four years of training in pathology, had been with the Coroner's office for three years, and had performed over 1000 autopsies. Dr. Culala further testified that it was his professional opinion, based upon a reasonable degree of certainty, that the cause of Hall's death was a cranial cerebral injury in association with the fracture of ribs.

Prior to performing the autopsy, Dr. Culala was informed that Hall had suffered a blow on the head. Dr. Culala explained at trial that he first externally viewed the body noticing bruises on the face, upper back and skull and that he then made a y-shaped incision into the chest and observed all the organs. Dr. Culala found nothing significant to explain the cause of death except a fractured rib which contributed to the cause of death. Dr. Culala then made a v-shaped incision into the skull and noticed that the brain was markedly swollen. The bruise which Dr. Culala had first noticed externally was actually a contusion with bloody fluid under the skin, but above the skull. The contusion involved the entire depth of the skull, and based on its appearance and pattern, did not occur after death. Dr. Culala explained that the swelling itself was due to a head trauma. Generally, it has a detrimental effect on the circulatory,

respiratory, and other bodily functions. In fact, it can stop the heart beat, resulting in cardiac arrest. Dr. Culala's testimony was that the subsequent swelling from the trauma takes several minutes to several hours. According to Dr. Culala, any heavy blunt instrument, could have caused John Hall's head injury. Dr. Culala speculated, when asked by defense counsel, that the injury could have been caused by a fall.

On cross-examination, Dr. Culala admitted that he did not consult with Dr. Say or Dr. Wallyn who treated the deceased at St. James Hospital, nor did he see the emergency department records or electrographic record on Hall from the hospital. In Dr. Culala's opinion, it was not important to know how long Hall was dead prior to the autopsy. Portions of the external examination section of the Protocol (autopsy report) were not filled out by Dr. Culala, but some were noted and left out as unimportant. No tissue dissection or microscopic examination was done as part of the autopsy.

Dr. Culala did acknowledge that brain swelling can be caused by alcoholism, but noted that in the instant case the swelling was due to head trauma. A defense witness, Jerry Dorsey, testified that Hall had two beers before work the day of the incident. However, by stipulation, George Christopoulous, the coroner's toxicologist, testified that he received and analyzed blood, urine and bowel samples of John Hall on September 27, 1973, finding them negative for alcohol and organic substances.

On cross-examination, Dr. Culala acknowledged that his Protocol stated that John Hall was predisposed to a heart attack, but stated that his autopsy produced no "gross evidence" of any heart attack.

Defendant first contends that the trial court erred in denying his motion for a judgment of acquittal because the State failed to prove beyond a reasonable doubt that defendant acted without lawful justification. Defendant points to his testimony that he was harassed by Law and Mack the morning of the day of the incident; that he requested to go home prior to the incident, a fact corroborated by David McFadden, a State's witness; that the deceased went for a knife in his pocket before defendant struck the deceased; and the testimony of three State's witnesses that the deceased did, in fact, own a jack-knife.

■■■ Only three witnesses, the defendant, Kevin Law and John Mack, saw the actual incident. Mack confirmed that the defendant and Hall were arguing and that Hall shook his finger in defendant's face, but further stated that Hall never hit or attempted to hit the defendant. This was corroborated by Law. Both Mack and Law testified that the deceased had no weapon in his hand. Law further stated that Hall never reached into his pocket. We also note that defendant's testimony concerning harassment by coworkers prior to the incident is uncorroborated and that when the defendant requested McFadden for permission to leave, he

related no incident of harassment to McFadden. Lawful justification for great bodily harm to another exists if that person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *." (Ill. Rev. Stat. 1973, ch. 38, par. 7—1.) Defendant correctly points out that if a defendant introduces evidence which raises the issue of self-defense, it can be overcome only by proof beyond a reasonable doubt. (*People v. Graham* (1971), 2 Ill. App. 3d 1022, 279 N.E.2d 41.) However, considering the above conflicting testimony, we believe that the question of lawful justification was one of fact and as such, is properly left to the jury. (*People v. Harbin* (1975), 31 Ill. App. 3d 485, 334 N.E.2d 379.) We find that there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that the defendant did not act in self-defense.

Defendant next contends that the trial court erred in denying his motion for acquittal because the prosecution failed to prove beyond a reasonable doubt that the act of the defendant was the proximate cause of the death of John Hall. It is well settled that when the State has shown the existence of a sufficient cause of death through an act of the accused, the death is presumed to have resulted from such act unless it appears that death was caused by a supervening act disconnected from any act of the accused. (*People v. Ransom* (1975), 33 Ill. App. 3d 503, 341 N.E.2d 752.) Defendant contends that the evidence leads to the conclusion that Hall's death was caused by a heart attack and not by a blow from the defendant. Defendant here refers to two documents from the emergency department records at St. James Hospital. The first document, signed by Dr. Say, the physician who attended the deceased, indicates that the deceased was brought into the emergency room with injuries to his head and back and that he developed cardiac arrest five minutes after his arrival; that cardiopulmonary and respirative equipment was instituted for 30 minutes, at the end of which the patient's pupils became fixed and dilated and the electrocardio monitor indicated cardiac standstill; and that vital signs ceased to function and John Hall was declared dead at 3:41 p.m. The second document, an electrocardiographic report from Dr. Wallyn reports that decedent's heart experienced "ventricular fibration and cardiac standstill."

Defendant further argues that the autopsy report is incomplete and that said report and Dr. Culala's testimony indicate that Dr. Culala had, reached a conclusion as to the cause of death prior to the initiation of the formal autopsy. We first note that both the autopsy report and the records from St. James Hospital were refused as evidence by the trial court and that defendant does not contest in this appeal the propriety of that ruling. Therefore, much of defendant's argument is *dehors* the record. It is a well-established principle that matters not of record will not be

considered on review. *People v. James* (1975), 25 Ill. App. 3d 533, 323 N.E.2d 424 (abstract); *People v. Kendall* (1956), 7 Ill. 2d 570, 131 N.E.2d 519.

■■■ Furthermore, even considering these documents in this appeal, we find no merit to defendant's contention. Although there was an interval between the fight and decedent's death, this does not preclude a finding that the fight caused the death. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225; *People v. Arnold* (1967), 89 Ill. App. 2d 185, 232 N.E.2d 483.) Also, Dr. Culala, who had performed over 1000 autopsies gave unrebutted testimony establishing a causal connection between defendant's hitting Hall and Hall's subsequent death. Dr. Culala testified that he performed the autopsy the day of Hall's death and, based on the autopsy, that it was his professional opinion, based upon a reasonable degree of medical certainty that the cause of John Hall's death was a "cranial cerebral injury in association with the fracture of ribs." Furthermore, this conclusion does not contradict either of the two documents which indicate that defendant experienced cardiac arrest. Dr. Culala noted in his testimony that the swelling in decedent's brain could affect the heart to a point where it stops beating entirely, resulting in cardiac arrest. On cross-examination Dr. Culala did acknowledge that the deceased was predisposed to a heart attack but stated that his autopsy produced no "gross evidence" of a heart attack. Additionally, Dr. Culala acknowledged that brain swelling can be caused by alcoholism, but that in this instance the swelling was due to head trauma. Also, George Christopoulous, the coroner's toxicologist, testified that he received and analyzed blood, urine and bowel samples of John Hall and found these negative for alcohol and organic substances.

Considering Dr. Culala's extensive and unrebutted testimony, we conclude that it was proven beyond a reasonable doubt that Hall's death occurred as a direct and proximate result of a blow to the head administered by defendant.

Defendant next contends that the trial court erred in denying his motion for a new trial based on the fact that Dr. Say, although listed by the State as a prospective witness, was never called by the State and was unavailable to the defendant at the time of trial. Section 114—9 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 114—9) provides in pertinent part that "[o]n motion of the defendant the court shall order the State to furnish the defense with a list of prosecution witnesses and their last known addresses * * *." Pursuant to defendant's motion, the State furnished a list of witnesses, one of whom was Dr. Say, the emergency room physician who treated the deceased and pronounced him dead of cardiac arrest. Dr. Say was never called during trial as a witness by the State and defendant contends that Dr. Say was, in

fact, out of the country at the time of trial. Also, attached as an appendix to defendant's brief is the affidavit of Dr. Say which indicates that Dr. Say was never subpoenaed by the State or otherwise notified that he was to testify at trial.

■■■ The committee comments to section 114—9 of the Code of Criminal Procedure clearly indicate that the State is not required to call every witness on its list of witnesses. (Ill. Ann. Stat., ch. 38, par. 114—9, Committee Comments, at 192 (Smith Hurd 1970).) As the State correctly notes in its brief, the defendant cannot reasonably rely on a nonexistent duty of the State. Furthermore, both Dr. Say's name and address and the emergency room records at St. James Hospital were available to the defendant at least six months before trial. The defendant never contacted Dr. Say before trial, nor did the defendant intend to call Dr. Say as his own witness. Instead, the defendant intended to prove that Hall died of a heart attack through a cross-examination of Dr. Say. Furthermore, we believe it stretches credulity for defendant to claim that Dr. Say was a crucial witness in light of the following facts: defendant never contacted Dr. Say prior to trial, never requested a continuance in order to avail himself of Dr. Say's testimony, never brought the question and importance of Dr. Say's absence up to the trial court until several weeks after the trial's termination, and never included in Dr. Say's affidavit what Dr. Say would have stated had he been called as a witness. For the above reasons, we find no error in the trial court's ruling denying defendant's motion for a new trial based upon the State's failure to call Dr. Say as a witness.

■■ Defendant further contends that the trial court erred in instructing the jury on the issue of self-defense. The following instructions, Illinois Pattern Jury Instructions, Criminal, Nos. 4.13 and 24.06 (1968), were tendered by the prosecution and given to the jurors by the trial court.

> "When I use either of the phrases 'reasonable belief' or 'reasonably believes' I mean that the person concerned, acting as a reasonable man, believes that the described facts exist."

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

Defendant tendered four instructions on the issue of self-defense, all of which were refused by the trial court. Defendant contends that three of the four instructions more accurately and fully explain that actual danger is not necessary to justify an act of self-defense, more fully explained the

term "reasonably" and better describe the amount of force permissible in defense of oneself. Assuming, without deciding the instructions proffered by defendant on the above points accurately stated the law, we must still conclude that the trial court did not err in refusing these instructions. It is well established that it is not error to refuse a requested instruction that accurately states a principle of law applicable to a case, if that principle has already been covered accurately and sufficiently by another instruction given. (*People v. Fann* (1975), 29 Ill. App. 3d 154, 329 N.E.2d 360 (abstract).) Each of the above points were accurately and sufficiently covered in the instructions tendered by the prosecution. As such, each of the above three instructions requested by the defendant were properly refused by the trial court as repetitious. See *People v. Robinson* (1973), 14 Ill. App. 3d 135, 302 N.E.2d 228.

■■ Defendant further contends that his fourth instruction refused by the trial court indicates that one who is first assaulted has a right to stand his ground and has no duty to retreat before defending himself and was improperly refused by the trial court. It is true, as defendant contends, that no instruction was given on this point. It is also true, and acknowledged by the State, that such has been the law in Illinois since 1902. (*People v. Harris* (1970), 124 Ill. App. 2d 234, 260 N.E.2d 325.) However, nowhere does defendant's proffered instruction on the above point mention that only *one who is first assaulted* has no duty to retreat. As such, defendant's instruction did not accurately state the law. We note further that the question of whether defendant was first assaulted was an important issue of fact from the testimony adduced at trial. Had defendant's instruction accurately stated the law, the trial court should have accepted the instruction. However, since defendant's instruction did not accurately state the law, the trial court properly refused said instruction. *People v. Lucus* (1968), 41 Ill. 2d 370, 243 N.E.2d 228.

■■ Defendant finally contends that the trial court erred in refusing his request to make an offer of proof pursuant to his motion to strike the jury panel. Prior to the selection of jurors in the trial court, defendant argued that the panel was selected in violation of Illinois law because the selection process systematically excluded members of the Negro race. The pertinent section of the Criminal Code, section 114—3 (Ill. Rev. Stat. 1973, ch. 38, par. 114—3), reads, in pertinent part, as follows:

"(a) Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the voir dire examination. For good cause shown the court may entertain the motion after the voir dire has begun but such motion shall not be heard after a jury has been sworn to hear the cause.

(b) The motion shall be in writing supported by affidavit and

shall state facts which show that the jury panel was improperly selected or drawn.

(c) If the motion states facts which show that the jury panel has been improperly selected or drawn it shall be the duty of the court to conduct a hearing. The burden of proving that the jury panel was improperly selected or drawn shall be upon the movant. * * *"

The above section provides that the motion shall be in writing supported by affidavit and shall state the supporting facts. The instant record indicates that defendant neither presented an affidavit nor supporting facts when he moved to strike the jury panel. Due to defendant's failure to follow the proper procedure, the trial court was under no duty to conduct a hearing on defendant's motion and did not err in refusing defendant's request to make an offer of proof.

For the abovementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNAMARA and MEJDA, JJ., concur.