THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL LEROY MULLENS, Defendant-Appellant.

First District (3rd Division)   No. 77-965

Opinion filed November 29, 1978.

James J. Doherty, Public Defender, of Chicago (Anthony F. Rusnak and Suzanne M. Xinos, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Thomas V. Gainer, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

The defendant, Michael Leroy Mullens, received a sentence of 7 to 21 years after his conviction in a bench trial of rape, burglary and armed robbery. A review of the defendant's contacts with the Harvey police authorities preceding his indictment on these charges will assist in understanding the issues raised by this appeal.

The defendant's first encounter with the law in Harvey occurred at approximately 3:30 a.m. on July 13, 1975 as he was walking south on the 150th block of Paulina Street in Harvey. Harvey Police Officer Briggs testified that while on a routine patrol in a marked car he received a radio communication of a prowler, described as a male Negro, looking in a rear window in the vicinity of 150th and Paulina. The officer drove to 151st and Paulina, and parked his car facing north at the intersection so that he would have an unobstructed view of the entire block to the north. Within a few minutes, he observed the defendant about a third of the way down the block south of 150th Street, and when the defendant came abreast of the police car, Officer Briggs stopped him. Responding to Officer Briggs' inquiry, the defendant gave his name, told the officer he lived at the Harvey YMCA and produced identification consisting of a card which had his name and picture, his date of birth, his social security number and his address in Detroit, Michigan. Officer Briggs asked the defendant why he had not seen the defendant walking down the first third of the block, and the defendant answered he had been urinating in a bush.

Officer Briggs and the defendant differed as to what happened next.

The officer testified he asked the defendant to accompany him to the Harvey police station to fill out a field identification card. He stated he told the defendant the police station was closer to the YMCA than where they were, so that the defendant would be getting a lift part way to where he was staying. The defendant, according to Officer Briggs, voluntarily entered the police car for a ride to the station.

The defendant's testimony, on the other hand, was that after he answered the officer's questions and produced his identification card, Officer Briggs patted him down, told him he was under arrest, placed him in the squad car and took him to the police station.

At the station, Officer Briggs prepared a field interrogation card on the defendant. This record called for the defendant's name, address, telephone number, possible nickname, and a physical description of the subject as well as a description of his clothing. Defendant was kept at the station for 10 to 15 minutes and then released.

After the defendant left, an inquiry on him was instituted through the National Crime Information Center, an organization which furnishes intelligence on wanted subjects. The record does not show that the information concerning the defendant given to the National Crime Information Center was anything other than what the defendant supplied to Officer Briggs before, according to the defendant, he was placed under arrest and transported to the Harvey police station. The response to the Harvey police from the National Crime Information Center was that the defendant was wanted in Missouri on a fugitive warrant. This response set in motion a series of moves by the Harvey police which culminated in his being charged with rape, burglary and armed robbery. The conduct of the police before he was charged with these crimes became the subject of petitions by the defendant to quash his subsequent arrest and suppress evidence.

At approximately 4:30 a.m. on July 13, 1975, Officer Briggs and other Harvey police officers went to the Harvey YMCA, used a master key which the YMCA's security officer supplied and in the presence of the security officer opened the door to the defendant's room. Inside, the police officers and the security officer found the defendant lying on the bed asleep. Officer Briggs lifted the defendant off the bed, handcuffed him and moved him to one side of the room. While this was taking place, the other officers commenced to search the room, checking the mattress, opening the drawers and going through the closet including opening an attache case which they found in the closet. The police officers continued to search the room for 5 to 10 minutes after the defendant was taken out of it.

The security officer testified that while the police were searching the room, he told them that he would not permit them to remove anything unless they had a search warrant. When the police officers entered the

room along with the security officer there was a television set on a table in plain view. While in the room the officers pulled a drawer out of the table and spilled its contents consisting of coins and bullets on to the floor; one of the officers took the coins and bullets with him when he left notwithstanding the security officer's admonition. The officer also took a small knife which he found in the drawer. The television set was not taken because the security officer insisted the officers leave it in the room until they had a search warrant. Before leaving the room the police sealed it.

Later that day after further discussion between the Harvey police and the YMCA security officer in which the latter persisted in his refusal to permit the police to take the television set until they had a search warrant, the defendant signed a consent-to-search form. When presented with that consent, the security officer permitted the police to search the room again and to seize the television set as well as other items which had not been in plain view. The arrest of the defendant at the YMCA and the search and seizure of items in his room resulted in the Harvey police connecting him with a rape, burglary and armed robbery which took place in a home in Harvey in the early morning hours a week prior to defendant's contact with the Harvey police.

The victim of that offense testified that shortly after 1:30 a.m. on July 6, 1975, she was awakened in her bedroom by a man standing over her with a gun pointed at her head. The man, after calling her by her first name, threatened to kill her if she moved. In the light cast by a small television in the room, the victim was able to see that the man was wearing a blue denim hat and to describe him as weighing 130 pounds and being about 5 feet 8 inches tall. The invader instructed the victim to turn over, covered her head with a sheet and had sexual intercourse with her.

The man then asked the victim whether there were any guns or money in the apartment. She replied that there were coins as well as a pistol on a dresser and a rifle in a closet. While lying in bed with the sheet over her head, the victim could hear the man rummaging through the drawers and closet. She could also hear him talking to her and recalled that he mentioned her name at least twice. After awhile, the man stopped talking and the sound of things being disarranged stopped. The victim got up, called her husband and called the police. Before the police arrived she noticed that some coins, a handgun and a rifle and a 4-inch portable television which had been in the bedroom were missing. When the police arrived, she described what happened and a Harvey police officer testified that she told him at the Harvey police station on July 7, 1975 that she could not identify the person who attacked her but that she would be able to identify his voice.

The day following the rape, the victim attended a voice lineup at the

Harvey police station. Although she did not enter a room where the lineup was conducted, she could hear the voices of several men inside. After hearing them repeat various statements she said had been made by the man who raped her the night before, she claimed to recognize the voice of John Dismukes as her assailant. Dismukes was picked up earlier that day by the Harvey Police Department, and when picked up he was wearing a blue denim hat. The victim had never met Dismukes before, but her husband had known him for some time prior to the rape incident. The victim signed criminal complaints charging Dismukes with the offenses committed against her on the night of July 6, 1975.

On July 11, the rifle which was taken from the victim's home was returned to her husband along with 35 rounds of ammunition. The weapon had been found a day earlier by a resident of Harvey and turned over to the police.

When the police arrived at the victim's apartment shortly after she reported the rape, she informed them that the window screen had been removed, the window had been opened and that a television set which sat on a table in front of the window had been moved. The television set to which the victim referred was not the one which her assailant took from her apartment. One of the police officers, Officer Ziolkowski, who was qualified to process criminal scenes for latent fingerprints, but not to make comparisons between inked and latent impressions, proceeded to dust the television and the table with a silver powder. He placed adhesive lifting paper over the dusted area and lifted two prints including what he believed was a palm print from the television set and another from the table. Officer Ziolkowski taped the adhesive lifting paper with the latent prints to a piece of green plastic trash can liner which the victim gave him. The reason for using the trash can liner was because the kit Officer Ziolkowski had with him did not contain material suitable for receiving the lifting tapes. The officer did not place his initials on the paper, or the date or a notation of the place the prints were found. Nor did he place any identification marks on the lifts.

Testimony of experts in dealing with and identifying fingerprints established that the usual procedure followed by police officers in recovering latent prints is to mark the lift with the name and address of the victim, the date the crime occurred, the nature of the crime, the type of powder used to lift the print and the item from which the print was lifted. In addition, it is customary for the person lifting the print to place his own initials on it for purposes of later identification.

Officer Ziolkowski testified that he brought the trash can liner with the latent lifts to the police station where he placed it in the top, center drawer of his desk. Some time later, he retrieved the trash can liner from his locked desk drawer and gave it to Harvey Police Detective

Graves. At the time he turned the lifts over to Detective Graves, he told the detective where and how he found the latent prints.

Officer Ziolkowski also testified that the prints introduced in evidence were the ones he lifted at the rape scene. He was sure of this because of the manner in which the lifts were affixed to the plastic trash can liner and because of a white strip of paper on the lifts which indicated the beginning of a roll of adhesive tape. In addition, the officer testified he clearly remembered placing the lifts on the trash can liner.

Detective Graves testified that he received the prints from Officer Ziolkowski on July 7, 1975, and placed them in a wall locker on which he had put a combination lock where they remained until July 14, 1975. After the defendant's arrest at the YMCA, Detective Graves took his palm prints, and on July 14, 1975, Graves delivered defendant's palm prints, imprints taken earlier from Dismukes and the latent lifts on the trash can liner to Jacqueline Fracaro, a latent print expert at the Illinois Bureau of Identification.

Fracaro expressed the opinion that one of the latent prints was identical to the right hand inked palm print of the defendant, there being some 25 to 30 points of identification. Although Fracaro testified that the usual procedure for marking lifts of latent prints to assure the certainty of their later identification had not been complied with by the Harvey police, she also stated that the lack of identifying marks on the plastic trash can liner delivered to her did not affect her ability to compare those latent prints with the defendant's inked palm prints.

The day after the defendant's arrest, the victim and her husband went to the police station and identified the television set which the police had taken from the defendant's room as the one taken from their apartment the night of the rape and reclaimed it. The victim was not able, however, to identify the defendant as her attacker. On July 17, 1975, the victim filed a complaint charging the defendant with rape, burglary and armed robbery.

It was stipulated that the defendant was approximately 6 feet 1 inch in height and weighed approximately between 170 and 180 pounds.

The trial court denied the defendant's motion to quash his arrest at the YMCA on the morning of July 13, 1975. At the same time, the trial court granted the defendant's motion to suppress all of the evidence seized in his room at the YMCA except for the television set. The motion to suppress with respect to the television set was denied and its introduction in evidence was permitted on the theory that it was in plain view of the police officers when they entered the defendant's room.

The defendant's appeal from his conviction raises the following issues: (1) should his arrest at the YMCA on charges of being a fugitive from Missouri have been quashed on the ground that it was the result of an earlier illegal arrest by Officer Briggs when he encountered the

defendant on Paulina Street; (2) should the television set seized in the defendant's YMCA room and offered in evidence have been suppressed as the fruit of an unlawful arrest; (3) does the plain view doctrine justify the warrantless seizure of the television set observed on a table in the defendant's YMCA room; (4) if the introduction of the television set in evidence against the defendant was error, was this error harmless; and (5) did the State establish a sufficient foundation of reliability to justify the admission of latent palm print evidence.

■■ The trial judge found that the defendant did not accompany Officer Briggs voluntarily to the police station. Instead he went there because Briggs at some point while they were on Paulina Street told him that he was under arrest. The trial judge concluded this arrest was improper. However, the trial judge also concluded that Officer Briggs had the right to stop the defendant when he encountered him on Paulina Street for a reasonable time and request that he identify himself. The trial judge concluded that prior to the defendant's initial arrest, Officer Briggs learned all the police needed to know about the defendant to submit information to the National Crime Information Center which was answered with the disclosure that the defendant was a wanted fugitive. Consequently, his subsequent arrest at the YMCA on the fugitive warrant was not the result of anything of which the police first became aware following an illegal arrest. We agree with this analysis; our view is that the trial judge did not err in denying the defendant's motion to quash his arrest.

The authority of a police officer to stop a person in a public place and interrogate him when the officer infers from the circumstances that the person has committed a crime is fully and clearly explained in *People v. Smith* (1977), 51 Ill. App. 3d 87, 366 N.E.2d 426. That decision instructs us that the burden of proving that a search and seizure in a public place was unlawful is on the person who seeks to quash his arrest or suppress evidence seized during the search. In determining the propriety of a motion to quash or suppress, a reviewing court should affirm the conclusion of the trial court unless its decision was "manifestly erroneous." *Smith*, at 90.

■■ This court concluded in *Smith* that the trial court was not manifestly erroneous in its determination that a police officer, informed that a window in a business had been broken, acted properly in approaching a person he saw peering through a nearby tavern window, and asking for his name and address and an explanation of his presence near the site of the store with the broken window. Similarly here, we conclude that the sanction the trial judge gave to Officer Briggs' interrogation of the defendant to the point where the trial judge found the defendant was placed under arrest was not manifestly erroneous. In fact, we find no valid objection to Officer Briggs' conduct when he stopped the defendant

on Paulina Street to ask him for his name and address and for his identification. The propriety of the questions Officer Briggs asked the defendant is to be appraised on the basis of the officer's ability to point to specific and articulable facts and inferences therefrom which warranted his stopping the defendant and requesting that the defendant identify himself. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80.) In view of the circumstances which existed when the officer first observed the defendant, the trial court did not err in holding that Officer Briggs acted properly in stopping the defendant and asking for his name and address and to supply identification. These circumstances were the report Officer Briggs had received a few minutes earlier of a prowler looking into a rear window of a residence in the vicinity at 3:30 a.m. coupled with the fact that the defendant suddenly appeared walking one-third of the way down the block that Briggs had under observation when the officer had not previously observed anyone walking on the block.

It is relevant to emphasize that our analysis of the defendant's initial contact with the Harvey police authorities on July 13, 1975, and his subsequent arrest at the YMCA, requires us to determine only whether it was reasonable under the circumstances to stop the defendant and ask him to supply his name and address and some identification. We are not required to determine whether the arrest of the defendant at 151st and Paulina was proper. The defendant in his brief in this court relies upon several cases relating to search and seizure. These cases do not support the view that Officer Briggs' mere request for information from the defendant was improper, and they are all concerned with more than pre-arrest interrogation. They involve, for example, warrantless arrests, detention to obtain fingerprints and stops followed by pat-downs or searches which disclosed concealed weapons, evidence carried by the person who was searched which incriminated him, or possession of narcotics. Even *People v. Smith,* on which the State relies, involved the initial interrogation of the defendant regarding his identity followed by a pat-down which revealed watches in the defendant's pocket which had been taken a few minutes earlier from the store with the broken window. Because, as pointed out below, neither the pat-down of the defendant nor his arrest by Officer Briggs on Paulina Street disclosed any information Officer Briggs had not already learned by talking to the defendant immediately after stopping him, our view is that his initial arrest did not develop information needed by the Harvey police to discover that he was a fugitive. For that reason, decisions in which the police, through a pat-down, arrest or detention, acquired knowledge or evidence they did not previously have are not relevant to the issue raised in this case.

■■ We accept, as the trial court apparently did, the defendant's version of his encounter with Officer Briggs which is that after answering the

officer's questions and producing his identification he was told that he was under arrest. Nevertheless, the record fails to establish that the information the defendant gave the police following his arrest which was incorporated in the field interrogation card rather than the information concerning the defendant Officer Briggs already had before placing him under arrest on Paulina Street led to the discovery he was a fugitive and his later arrest for that reason at the YMCA. This is why in our view it is unnecessary to determine whether his first arrest in Harvey was a lawful one. The defendant has not shown that the Harvey police used information in getting a response from the National Crime Information Center other than the identification and addresses the defendant gave Officer Briggs before that officer told him he was under arrest. Nothing in the record indicates that the police learned of the Missouri warrant through the use of any information that Officer Briggs did not already have before placing the defendant under arrest. For that reason, the defendant has not discharged his burden of showing that any additional information acquired during the brief period he was in custody was essential to the response from the National Crime Information Center which, in turn, led to the defendant's subsequent arrest at the YMCA. The latter arrest, based on the notice that the defendant was wanted as a fugitive, was therefore proper.

We next consider whether the trial court erred in denying the defendant's motion to suppress the use of the television set as evidence, and if so whether the error was, as the State contends, harmless. In its brief in this court the State does not discuss whether the seizure of the television set was proper; it argues only that the defendant was not prejudiced by the evidence of the television set because of the overwhelming evidence of the defendant's guilt even without regard to the fact that he was found in possession of the television set taken from the victim's apartment. Nevertheless, we will address ourselves to the other issues raised by the defendant regarding the use of the television set as evidence.

Because we have already concluded that the warrantless arrest of the defendant at the YMCA was not unlawful, there is no reason to suppress the use of the television set as the fruit of an unlawful arrest. However, the introduction of the television set in evidence was still improper; the trial court erred in justifying the warrantless seizure of the television on the theory it was in plain view. Under the plain view doctrine, in addition to an initial unlawful intrusion which affords the authorities the opportunity for the plain view, it is necessary to establish that the incriminating nature of the evidence in plain view was immediately apparent to the arresting officers. (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022; *United States v. Clark* (8th Cir. 1976), 531 F.2d 928; *People v. Holt* (1974),

18 Ill. App. 3d 10, 309 N.E.2d 376; *People v. Eastin* (1972), 8 Ill. App. 3d 512, 289 N.E.2d 673.) In *Holt*, this court explained this additional requirement of the plain view doctrine as follows:

> "That an item is in plain view is not sufficient by itself to justify the warrantless seizure of evidence. In addition, * * * the facts and circumstances known to the officer at the time he acts must give rise to the reasonable belief that the item seized constitutes evidence of criminal activity." *Holt*, at 12.

Although the police lawfully entered defendant's room to arrest him on a fugitive warrant and the television set was in plain view, there is no adequate foundation in the record to support the conclusion that the incriminating nature of the television was immediately apparent to the police officers. There was obviously no connection between the television set and the fugitive warrant and the television was not contraband. The record does not indicate that any of the officers believed that the television was evidence of any crime; there is no suggestion in the record that when the police entered the defendant's room and saw the television set, they had any reason to believe he was connected with the rape which occurred a week earlier. Therefore, although the police officers were lawfully in the defendant's room, the plain view doctrine did not justify the warrantless seizure of the television set.

■■ The trial judge ruled that the search of the defendant's drawers and closet was unlawful, and because the search was unlawful, he also rejected the validity of the consent-to-search form which the defendant signed a few hours after his arrest. However, the trial judge excepted the television set from his ruling because it was found to be in plain view. For the reasons set forth above, the warrantless seizure of the television set, when the police had ample time to obtain a search warrant, was as improper as the seizure of the items not in plain view; the trial judge erred in failing to suppress its use as evidence.

■■ The test of the State's contention that if the introduction of the television set was improper, the error was harmless, is not whether there is other evidence of guilt, but whether the use of the television set did not, beyond a reasonable doubt, contribute to the defendant's conviction. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Smith* (1967), 38 Ill. 2d 13, 230 N.E.2d 188; *People v. Spencer* (1972), 7 Ill. App. 3d 1017, 288 N.E.2d 612.) The trial judge himself provided the answer to this test when at the conclusion of the trial, he summarized the evidence and stated that the question for the court was to determine whether the fingerprint of the defendant found in the apartment at the time of the rape incident and his possession of a television set that was taken out of the apartment was sufficient to convict him. The trial judge also stated:

"The prints put the defendant, if not in the house, at least it puts his hand on the table that was located in the house in front of the window, through which entry was made. The defendant also had in his possession a television set, in his room, that was identified by the complainant as being their television set; or at least in their control and was taken out of their house on the night of the burglary and rape."

In view of the trial judge's own statements, as well as inconsistencies in the record such as the victim's complaint against Dismukes before she filed her complaint against the defendant and the discrepancy between her description of the height and weight of her assailant compared with that of the defendant, we conclude that in deciding whether the defendant was in the victim's apartment on July 6, 1975, the trial judge relied on defendant's possession of the television set a week later as well as on the fingerprint evidence. For that reason we cannot say that the introduction of the television set as evidence was harmless. This matter must, therefore, be reversed and remanded for a new trial.

Finally, because at a new trial the defendant may persist in his objection to the use of the fingerprint evidence, we shall consider whether a continuous chain of possession of the fingerprints from the time they were left in the victim's apartment immediately following the rape incident to their delivery to Jacqueline Fracaro at the Illinois Bureau of Identification was sufficiently shown to establish a foundation for their admission and to deny the defendant's motion to suppress this evidence. The testimony of Officer Ziolkowski, Detective Graves and Jacqueline Fracaro establishes a continuous, unbroken chain of possession with respect to the lifts placed on the plastic trash can liner. Ziolkowski's testimony shows that he lifted the prints in the victim's apartment, placed them on the trash can liner, brought them to the police station, and put them in his desk drawer which he locked. Following that he gave the prints to Detective Graves, relating to Graves at the time when and where he recovered them. Graves' testimony was that he put the trash can liner with the lifts into his wall locker, locking the combination lock to which only he knew the combination. Subsequently, Graves removed the trash can liner from the locker and delivered them with other items to Fracaro. She testified that the lifts she examined and on which she was expressing her opinion were the ones that she received from Graves.

■█ The fact that Officer Ziolkowski failed to mark the trash can liner for later identification does not destroy the evidence of the chain of possession in this case. In *People v. Hines* (1971), 131 Ill. App. 2d 638, 645, 267 N.E.2d 696, admission into evidence of certain bullet fragments recovered from the scene of a shooting was upheld even though the police officer who found the fragments failed to mark them for later

identification. The court found the fragments admissible on the ground that their possession was traced by the evidence from the officer who recovered them to the ballistics expert who examined them. Whether in this case the People established a continuous chain of possession sufficient to negate the possibility of tampering or substitution was a question to be decided by the trial judge in disposing of the defendant's motion to suppress the latent palm-print evidence; there was sufficient evidence, if believed by the trial judge, to support his conclusion that the evidence of the trash can liner and the latent prints found on it should not be suppressed.

For the reasons stated above, this case is reversed and remanded for a new trial.

Reversed and remanded.

JIGANTI, P. J., and McNAMARA, J., concur.