THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* REGINALD BEACHAM, Defendant-Appellant.

First District (4th Division)    No. 78-2134

Opinion filed July 31, 1980.—Rehearing denied September 2, 1980.

458

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Michael K. Demetrio, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Reginald Beacham, was found guilty of two counts of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2). He was sentenced to a prison term of 13 to 24 years.

On appeal, defendant contends: (1) the trial court erred in denying defendant's motion to quash his arrest and suppress certain evidence; (2) the trial court erred in denying defendant's motion to discharge the jury; (3) the trial court erred in allowing the prosecutor to cross-examine defendant and a defense witness about unrelated criminal conduct; and (4) the trial court abused its discretion and erred by imposing an excessive sentence. We affirm.

Although no issue is raised as to the sufficiency of the evidence, we nevertheless find it necessary to discuss, in some detail, the testimony presented at the hearing on defendant's motion to quash the arrest and suppress the evidence seized.

Defendant's first witness, police officer Patrick Martin, testified that he had 12 years experience as a Chicago police officer. On May 11, 1976, at approximately 1 p.m., he and his partner, Officer Falinazzo, were patrolling the area of West End and Pulaski Streets. The police department had designated this neighborhood a high crime area. Martin observed defendant walking southbound on Pulaski Street. Defendant was carrying a number of fur coats. Martin stated he was not aware of any furrier or cleaner in that part of the neighborhood.

Martin further asserted that the officers drove their squad car alongside defendant. As Martin got out of the squad car, defendant began to run northbound on Pulaski Street. Martin called to defendant to halt. The defendant stopped and walked back to the squad car. Martin then asked defendant to tell him his name. He also asked defendant to explain how he came to have the fur coats in his possession.

Defendant told Martin that he was a pimp and that he had reclaimed the coats from his "lady," "Donna," because she had left him to work for another pimp. Martin and his partner then asked defendant for the full name and address of defendant's lady friend. Defendant responded, relating his lady friend's name and giving as her address a building which

was approximately 100 yards from where they were standing. Martin noted that when he initially observed defendant, defendant was walking toward, not away from, the address he had just given.

Martin further testified that while he and Falinazzo were talking to defendant, they were taking the coats from defendant and examining them. Although Martin could not remember what initials were sewn into the lining of each coat, he stated that none of the coats had the initial "D" on the inside lining. Martin then placed the coats on the backseat of the squad car and asked defendant if Donna would be home and if she would be able to verify ownership of the coats. Defendant indicated Donna was at home and would verify ownership. Martin further stated that at that point defendant asked him and his partner to take defendant to his lady friend's home.

Martin also stated that for protective purposes, he conducted a "field search pat down" of defendant for weapons. While "patting down" defendant, Martin felt something in the pocket of defendant's pants. When Martin asked defendant what was in his pocket, defendant responded that the objects were rings. Upon a request from Martin, defendant removed the rings from his pocket and gave them to Martin. Defendant told Martin he also had repossessed these rings from Donna. Martin did not return the rings to defendant.

Defendant was then seated in the squad car and the police transported defendant approximately 100 yards to the address given by defendant. When they arrived at the location, however, the police noted that the address related to an alley and not a building. Defendant pointed to a specific flat in a nearby apartment building and indicated that it was the correct apartment. Martin then walked to the designated flat. Martin knocked on the door of the apartment, but no one responded to the knocking. A tenant of the building told Martin that the apartment was vacant.

When Martin returned to the squad car and informed defendant that the apartment he had designated was vacant, defendant told Martin he must have knocked on the wrong apartment door. Defendant then offered to show Martin exactly where the apartment was located. As Martin and Falinazzo accompanied defendant to the building, a man, later identified as T. J. Miller, ran towards them and shouted to the police to hold defendant. Martin also said that Miller told them that defendant had robbed him. Miller appeared very excited and told them that defendant had tied his hands. Martin observed bruise marks on Miller's hand. Martin asserted that after Miller identified defendant as the man who had robbed him, Martin placed defendant under arrest and handcuffed him. Martin also testified that immediately after placing

defendant under arrest, he conducted a full search of defendant and discovered money in defendant's sock.

Martin and Falinazzo then transported defendant in the squad car to the address where the robbery had occurred. There, Wilma Boyd identified the rings which had been in defendant's possession as the rings which she stated defendant had taken from her. Miller identified the five fur coats, which defendant had been carrying when the police first observed him, as the coats which were taken from his apartment by defendant during the robbery.

Over defense counsel's objection, Martin further testified he first suspected that defendant was involved in criminal activity when he saw defendant carrying a number of fur coats and start running when he saw the police. Martin also stated that the weather was very sunny and warm and the neighborhood was a high crime area.

On redirect examination, Martin asserted that when he first saw defendant, defendant was carrying several coats over his left arm. Martin also stated that while he was talking with defendant about the ownership of the coats, he took each coat from defendant and examined it prior to placing it in the squad car. There were no price tags on the coats, and Martin was not aware of any reports that fur coats recently had been stolen. Martin also acknowledged that he had testified before the grand jury that defendant told him he was returning the coats and rings to a prostitute.[1]

Defendant testified in support of the motion to quash the arrest. He stated that on May 11, 1976, at 12:30 p.m., he was walking north on Pulaski Street. He was carrying some fur coats on a single hanger; he could not remember how many coats he had. Defendant also asserted that he was walking when the police officers ordered him to stop. When questioned about the coats, he told Martin that he was a pimp and he was returning the coats to his lady, Michelle Davis.

According to the defendant, the officers then took all the coats from him and placed them in the car. The police officers next asked where his lady friend lived and defendant told them. Defendant asserted that he then asked if he was arrested and the officers told him, "We'll find out when we get there."

Prior to being placed in the squad car, Martin frisked defendant. Defendant further asserted that after Martin felt the rings in defendant's pocket and questioned defendant about them, Martin reached into defendant's pocket and took the rings. Defendant told Martin that the rings belonged to his lady friend and he was returning them to her. On

[1] Defendant informed the court that Officer Falinazzo was not a necessary witness for the hearing on the motion to quash the arrest.

cross-examination, defendant admitted he had told the police officers his name was "Reggie Labell" rather than his true name.

Defendant further testified that the police did not conduct the full search of his person until he was brought to the police station. At that time, the police told him he was under arrest.

After arguments, the case was continued. Several weeks later, the trial court denied defendant's motion. In deciding the motion, the court made several findings of fact. The court determined that when the police officers drove their car alongside defendant, defendant started to run. Defendant stopped after Martin yelled, "Stop." Defendant approached Martin upon his request. The court also noted that no guns were drawn and there were no reports of recent crimes in the area. When Martin questioned defendant about the coats, defendant said he was a pimp and he was taking back the coats from his lady friend who had left him. When asked who the lady friend was, defendant responded that her name was Donna and she lived at 4038 West End Street. The court indicated the address was approximately 100 yards away from the location of defendant and the police.

The court further found as fact that while Martin was asking defendant where "his lady" lived, he was taking the coats from defendant and placing them in the squad car. The court ruled this action constituted a seizure.

The court also found that after the officers conducted a pat down search of defendant and asked about the objects in his pockets, defendant said they were rings and took them out of his pocket. Martin then took the rings from defendant and kept them. Although defendant was not handcuffed, defendant did not believe he was free to leave.

The trial court also determined that at the time Martin placed defendant in his car, he suspected the bundle of coats was acquired through some recent criminal act because of the unusual circumstances involving the possession of the fur coats by the defendant on a warm day, that defendant was in a high crime area, and that defendant ran when he saw the police. At this time, however, Martin did not intend to arrest defendant; he was "continuing his investigation." The court noted that Martin did not check to see if robberies or other crimes had been reported in this area although Martin had a police radio in his squad car.

The trial court also stated that defendant was detained approximately three to five minutes before the police transported him to the address which he had given. Noting that the address was nonexistent, the trial court found that defendant offered to show the police where the apartment was located. While they were approaching an apartment, Miller came towards them, told them he had been robbed and identified defendant as one of the three men who had robbed him and who had taken fur coats from his apartment. At this point in time, the trial

court found Martin told defendant, "You are under arrest," and, after searching him, recovered money from defendant's sock. Miller identified the fur coats and when defendant was brought back to Miller's apartment, a woman, Wilma Boyd, identified the rings and fur coats as belonging to her.

After reciting these findings, the trial court ruled the detention of defendant was reasonable and the seizure of the fur coats was proper and Martin's conduct comported with the requirements of the law.

At trial, Wilma Boyd, T. J. Miller and Otis White, testified as occurrence witnesses. Their testimony established that defendant was one of three men who entered Boyd's and Miller's apartment while White was visiting them. After the three men gained entry to the apartment, they talked with Miller and indicated they were police checking ownership of guns and jewelry.

The three men proceeded to the kitchen. Defendant told Boyd he was a detective investigating Miller's possible involvement in selling stolen goods. When Boyd got up, defendant produced a gun and said, "This is a stick up." Another man pointed a gun at Miller's head. Defendant told Boyd to "hit the floor, bitch" and after she obeyed, he tied her hands with an extension cord. White also was tied. Miller was taken into the living room.

Boyd also testified that defendant dragged her into the living room by pulling the extension cord which was tied around her hands. Defendant then ordered Miller to open his safe and he held a gun to Miller's head. Defendant then took two rings from Boyd's fingers. Boyd identified the rings at trial and Officer Falinazzo later identified the rings as the rings which were recovered from defendant. Boyd also testified that defendant obtained a key and searched through her locked closet which contained her winter fur coats. She identified the coats at trial, and Falinazzo later testified that defendant had these coats in his possession when he was stopped by the police.

Defendant called Corrine Davis, who testified she was staying with defendant in his apartment in the spring of 1976. On May 11, 1976, at about 9:30 a.m., she awoke to find the defendant dressing. Two men were standing at opposite ends of her bed. She did not know them. They told her to cover her head, which she did. They and the defendant then left the apartment. Later she noticed the lock on the apartment door had been broken. It had not been broken the night before the incident. On cross-examination, over defendant's objection, the State questioned Davis about her working as a prostitute for defendant.

Defendant testified in his own behalf that on May 11, 1976, three men came to his apartment, forced open the door and entered his flat. They had guns and threatened to kill defendant, his wife, and son if he did not give them drugs. When defendant said he had none, they threatened to

kill him if he did not tell them who did sell drugs. Defendant told them T. J. Miller was a drug dealer, fence, and professional gambler. Defendant asserted he was then forced to take the men to Miller's apartment and the men proceeded to rob Miller and Boyd. They ordered defendant to take the rings from Boyd. Defendant denied that he had a gun. He was ordered to grab some fur coats and leave with the coats, which he did.

On cross-examination, the State questioned defendant as to how he knew Miller was a drug dealer. He responded that he had indirectly purchased drugs from Miller. The State questioned defendant, over defendant's objection, about his involvement with drugs and about selling heroin.

After the State's rebuttal and closing arguments, the jury returned verdicts finding defendant guilty of the armed robbery. Defendant was later sentenced to a term of 13 to 24 years. Defendant now appeals.

OPINION

I

Defendant first contends that the trial court erred in denying his motion to quash the arrest and in allowing the introduction of improperly obtained physical evidence and identification testimony. Defendant argues that his motion should have been granted because the police officers acted unreasonably when they initially detained him and seized his property. We disagree.

■■ The burden of proving that a search and seizure in a public place was unlawful is on the person who seeks to quash his arrest or suppress evidence seized during the search. (*People v. Mullens* (1978), 66 Ill. App. 3d 748, 383 N.E.2d 1369; *People v. Smith* (1977), 51 Ill. App. 3d 87, 366 N.E.2d 426.) A court of review must affirm the trial court's ruling on the motion unless the trial court's ruling is manifestly erroneous. *People v. Mullens* (1978), 66 Ill. App. 3d 748, 383 N.E.2d 1369.

The test to determine the reasonableness of the officers' actions in stopping and frisking defendant is whether specific and articulable facts and circumstances exist which lead the officers to reasonably believe that the defendant is committing, is about to commit, or has committed a criminal offense. *People v. Lee* (1979), 69 Ill. App. 3d 756, 387 N.E.2d 1121; Ill. Rev. Stat. 1977, ch. 38, pars. 107—14, 108—1.01; see also *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624.

Viewed as a whole, the facts and circumstances must lead to the conclusion that the situation confronting the police officer is so far removed from the ordinary that any competent police officer would be

expected to act quickly to maintain the status quo, rather than to further observe the situation. *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624.

■ In the instant case, we believe the trial court properly ruled that Martin acted reasonably in stopping defendant and questioning him. Martin, an experienced police officer, testified that he first observed defendant carrying a bundle of fur coats on a warm, sunny day in May. There were no furriers or dry cleaners in the area and the neighborhood was known as a "high crime area." After the police drove their squad alongside defendant, he ran. These specific circumstances amply supported the officers' suspicions that criminal activity had been afoot. See *People v. King* (1978), 62 Ill. App. 3d 239, 379 N.E.2d 69; *People v. Cribbs* (1972), 8 Ill. App. 3d 750, 291 N.E.2d 326; *cf. People v. Montgomery* (1977), 53 Ill. App. 3d 298, 368 N.E.2d 752.

When questioned about the fur coats, defendant informed Martin that he was a pimp and he was taking the coats back from a woman named Donna. Defendant informed the police where Donna lived and Martin observed defendant was walking towards that address, not away from the address. This was an additional suspicious circumstance. (See, *e.g., People v. Smith* (1977), 51 Ill. App. 3d 87, 366 N.E.2d 426.) Martin took the fur coats from defendant and noticed that each coat contained a lining initial other than "D." The officer placed the coats in the squad car and asked defendant if Donna would verify ownership and defendant indicated she would.

In our opinion, the trial court's ruling that the seizure of the coats was reasonable is not "manifestly erroneous." Here, Martin articulated specific facts, which taken together with the natural inferences from these facts, made the instrusion upon defendant's privacy a reasonable one. The facts available to the officer at the moment of the seizure "* * * 'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate." (*Terry v. Ohio* (1968), 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) An officer investigating possible criminal conduct may rely upon his knowledge and experience and the reasonable inferences which may be drawn from the facts observed. *People v. Crawford* (1978), 64 Ill. App. 3d 861, 381 N.E.2d 1183.

We also believe the trial court correctly ruled that the subsequent "pat down" search of defendant and transportation to verify his story was reasonable under the circumstances. (*People v. Cribbs* (1972), 8 Ill. App. 3d 750, 291 N.E.2d 326.) In *Cribbs*, the police detained defendant for questioning after he attempted to flee from them. They then transported defendant in their squad car around the area. They discovered that the doors of an office building were open and a rental truck was parked near

the doors. One of the two stockholders of a corporation identified the property in the truck as corporate property. The court stated:

> "At a minimum, defendant's presence at the time and place in question, coupled with his attempt to flee was sufficient cause for the officers to detain him pursuant to the provisions of Ill. Rev. Stat. 1969, ch. 38, par. 107—14. We believe the reasonable scope of that statute, permitting detention for the purpose of questioning, also permits, under circumstances such as those present here, the detention to continue for a short period of time to enable the officers to compare the answers given by the detainee with the condition of the area in which he was discovered. When that comparison was made in the instant case the officers became aware of the entry which had been effected and the presence of the rental truck containing merchandise of the type expected to be found in an industrial concern. This knowledge, coupled with defendant's presence and his attempt at flight established probable cause for arrest beyond argument." 8 Ill. App. 3d 750, 753, 291 N.E.2d 326, 328.

It is equally apparent here that the police officers could detain defendant for the purpose of comparing or verifying his answers. Further, Martin testified that in order to protect himself he conducted a "pat down" of defendant's outer clothing. Such a limited search clearly is permissible when the police suspect defendant may be armed. (*People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570; see also *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488.) The subsequent seizure of the rings also was permissible. See *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488.

■■ Here, defendant's suspicious conduct and apparent flight gave rise to an inference of criminal activity which justified the initial detention for questioning. (*People v. Montgomery* (1977), 53 Ill. App. 3d 298, 368 N.E.2d 752; see also *People v. Basiak* (1977), 50 Ill. App. 3d 155, 365 N.E.2d 570.) Thereafter, Miller's arrival and subsequent identification of defendant as the person who had robbed him was sufficient to establish the probable cause necessary for a valid arrest. (See *People v. Montgomery* (1977), 53 Ill. App. 3d 298, 368 N.E.2d 752.) We conclude the trial court's denial of defendant's motion to quash the arrest and suppress the evidence was not "manifestly erroneous."

## II

Defendant next contends the trial court erred in denying his motion to discharge the venire since the jury panel had been improperly drawn and selected. In support of his motion defendant alleged that the 30 jurors called were alphabetically assigned juror numbers on the basis of their

last name in violation of the statutory mandate that jurors be randomly selected by chance. (Ill. Rev. Stat. 1977, ch. 78, par. 20.) Defendant declined argument on his motion and the trial court ruled that the motion lacked sufficient facts to warrant a hearing since "there [was] no allegation of fact, * * * that in any way suggests that the jurors represented by the numbers reflected here were chosen by any other manner than by lot."

■ It is evident from defendant's motion that he failed to show factually that the procedure by which the jurors were selected was improper. According to the order implementing the statute, "The supervisor of jurors shall use a revolvable hopper in which he shall deposit pellets numbered to correspond with the jury service numbers on the cards, and shall draw from the hopper as many pellets as the number of jurors requested. * * *" (Cir. Ct. Gen. Order No. 17.5(i).) Defendant's motion at trial did not attack this procedure, nor did it "show to the court that actual and substantial injustice * * * resulted or [would] result to him, because of the error or defect charged." (Ill. Rev. Stat. 1975, ch. 78, par. 35.) To sustain a challenge to an array, defendant must meet this requirement. *People v. Switalski* (1946), 394 Ill. 530, 69 N.E.2d 315; *People v. Mitchell* (1958), 16 Ill. App. 2d 189, 147 N.E.2d 883.

We believe the trial court's ruling was correct. The trial judge noted that the jurors he had called numerically from number 207 to 261 happened to follow alphabetically the jurors names beginning with "Belsaas" and ending with "Leska." Defendant's motion, however, failed to allege facts showing that the initial selection was not randomly made. A motion to discharge the jury must "state facts which show that the jury panel was improperly selected or drawn." (Ill. Rev. Stat. 1975, ch. 38, par. 114—3(b).) The court was under no duty to conduct a hearing unless the motion stated such facts. Ill. Rev. Stat. 1975, ch. 38, par. 114—3(c).

■ On appeal, defendant argues for the first time that statistically, the chance is rare that the alphabetical order of the last names of the 19 jurors called would follow the numerical order of the jurors' assigned numbers. Defendant now argues that this fact alone affirmatively establishes that an alphabetical order was imposed on the jury selection at some point. Whether this fact is true or not, we believe it was proper subject matter for defendant's motion and, since it was not presented to the trial court for consideration, we decline the invitation to review the allegation on appeal. *Cf. People v. Hughes* (1977), 46 Ill. App. 3d 490, 360 N.E.2d 1363.

Defendant cites *People v. Boston* (1923), 309 Ill. 77, 139 N.E. 880, and *People v. Lembke* (1926), 320 Ill. 553, 151 N.E. 535, for the proposition that a showing that the rules controlling the selection process are not followed is sufficient prejudice for reversal of the cause. First, we emphasize that in our view, defendant has not shown that the rules of the selection process were not followed. Second, both *Boston* and *Lembke*

are distinguishable factually from the case at bar. There, the records showed that *all* the substantial provisions of the selection statute were not followed. Both courts noted that mere irregularities in the selection which are not prejudicial are not a basis for reversal where there is substantial compliance with the law. *People v. Boston* (1923), 309 Ill. 77, 83, 139 N.E.2d 880, 882 (record showed there was no attempt made to select a jury in accordance with statute); *People v. Lembke* (1926), 320 Ill. 553, 559, 151 N.E. 535, 538 (record showed there was no compliance with all the substantial provisions of two important statutory sections).

The record here discloses that defendant failed to show any impropriety in the jury selection process. Accordingly, the trial court properly denied defendant's motion to discharge the jury.

## III

Defendant next contends that reversible error occurred when the State cross-examined defendant and a defense witness about conduct unrelated to the offense with which defendant was charged.

Defendant argues that the State should not have been allowed to cross-examine Corrine Davis as to whether she worked for defendant as a prostitute in May 1976. We find this argument without merit since defendant himself testified that he was a pimp and his lady friend worked as a prostitute for him. Accordingly, we cannot conclude defendant was prejudiced by the State's cross-examination of Davis as to her activities.

Defendant also argues that the State's cross-examination as to his alleged prior drug activity was in error. During direct examination, defendant testified that under the threat of death he agreed to take the men who had broken into his apartment to someone he knew was a drug dealer. Defendant brought the men to T. J. Miller, whom defendant described as a drug dealer, fence, and professional gambler.

On cross-examination, the State asked if defendant had bought drugs from Miller. The court instructed defendant to answer the question. The State then questioned defendant as to his participation in certain drug transactions.

We agree with defendant's assertion that this form of cross-examination was improper since an accused should not be required to defend himself against unrelated offenses which are not directly pertinent to the crime for which he is on trial (see *People v. Sanders* (1978), 59 Ill. App. 3d 650, 375 N.E.2d 921). The error here, however, does not require reversal.

Where, as here, the evidence of the defendant's guilt is overwhelming, the error complained of, to be reversible error, must be of a nature that results in substantial prejudice to the defendant and contributes to his conviction. Where that is not the case, we must necessarily

consider the error harmless. (*People v. Butler* (1978), 63 Ill. App. 3d 132, 379 N.E.2d 703.) The testimony of three eyewitnesses established that defendant participated in the armed robbery of Boyd and Miller. Defendant also later admitted lying to the police about his identity and his possession of the stolen property. We find the evidence of guilt so overwhelming that we necessarily conclude that the error committed by the State in referring to other possible criminal activities of defendant was harmless error.

## IV

Finally, defendant contends the case must be remanded for a new sentencing hearing because (1) he was unable to make an intelligent choice as to the sentencing alternatives he faced and (2) he was penalized for exercising his right to trial since the sentence imposed was twice the sentence the court would have imposed had defendant pleaded guilty.

### (1a)

Defendant first argues that a bona fide doubt as to his fitness for sentencing was raised because he refused to leave his jail cell, he would not communicate with his attorney, and he refused to respond to the trial court's questions. We disagree.

Unless the trial court has notice of facts which give rise to a bona fide doubt as to defendant's fitness, the trial court is not required to hold a fitness hearing. (*People v. McCullum* (1977), 66 Ill. 2d 306, 362 N.E.2d 307.) Further, it is within the trial court's discretion to determine whether there exists a bona fide doubt as to defendant's fitness since, unlike a court of review, the trial court is in a better position to observe and evaluate defendant's conduct. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) Thus, absent a clear showing of abuse of discretion, the trial court's determination will not be reversed on appeal. *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583.

We do not believe the trial court's determination here was an abuse of discretion. When the proceedings commenced for the purpose of sentencing defendant, the trial court informed trial counsel he had been advised by the deputies that defendant refused to go to court to be sentenced. The trial judge together with trial counsel and a court reporter, then proceeded to the lockup. There, however, defendant refused to respond to the trial court's questions. Defense counsel then informed the court that he had spoken with defendant who had a blank look and defense counsel determined that defendant would not come out to be sentenced. Defense counsel also stated he believed defendant was incompetent to be sentenced and defense counsel requested a behavior clinic examination of defendant.

Upon request, Deputy Alaisio testified as a court's witness that earlier in the day defendant refused to be handcuffed so he could be taken out to lunch. Alaisio also testified defendant told him he would not go to court at 1:30 p.m. to be sentenced. The trial court then indicated that during the course of the trial he had not observed anything about defendant which would create a bona fide doubt as to defendant's fitness. The court also noted that defendant's earlier conversation with Alaisio indicated defendant's competence to be sentenced. The court stated it had no doubt defendant was fit and competent to proceed with the sentencing hearing. Although the trial judge ordered a behavior clinic examination, the trial judge proceeded with the sentencing hearing. The report of the behavior clinic examination subsequently presented to the trial court indicated that the defendant was in fact competent and fit for the sentencing hearing.

We do not find any basis for declaring that the trial court's procedure was improper.

Defendant also asserts that since he refused to make an election to be sentenced under the "new" or the "old" sentencing code and he did not understand the court's explanation of the differences between the two codes, a new sentencing hearing is required. We do not agree with defendant's reasoning that because he *refused* to make an election, he therefore was *unable* to make an election. Were this the case, any refusal to participate in the sentencing hearing would necessitate a new fitness hearing. Such a result clearly is not within the statutory scheme.

We agree that under Illinois law, a defendant is considered unfit to be sentenced if due to a mental or physical condition he is unable to understand the nature and purpose of the proceedings or assist in his defense. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1(a)(1), (2).) Here, however, the trial judge found that defendant's statement to the deputy prior to the sentencing hearing, where defendant stated he would not leave the lockup at 1:30 p.m. for the sentencing hearing, indicated that defendant indeed understood the nature and purpose of the proceeding. We do not believe that this finding was an abuse of the trial court's discretion.

### (1b)

Defendant also argues that the trial court erred in sentencing defendant under the sentencing law in effect at the time of the offense after defendant refused to elect between this law and its subsequent amendment.

When a defendant has not been sentenced before February 1, 1978, section 8—2—4(b) of the Code (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1008—2—4(b)) accords a defendant the right to elect to be sentenced

under the law as it existed at the time of the offense or under the amended provisions of the Code that became effective February 1. Although as a practical matter, a trial judge may feel obligated to explain the old and new provisions prior to defendant's election, neither the statute nor any supreme court rule requires that specific admonitions by the court be given or that the election be knowing and intelligent. (*People v. Warfel* (1979), 67 Ill. 3d 620, 385 N.E.2d 175.) The right to elect between sentencing codes is a benefit conferred by statute, not a constitutional right. *People v. Grant* (1978), 71 Ill. 2d 551, 377 N.E.2d 4.

■■ That defendant did not avail himself of his benefit, is not, in our opinion, a sufficient reason to remand this cause for a new sentencing hearing. The trial judge complied with the statute's requirements when he advised defendant of his right to election. "The burden is not for the court but for counsel to explain and suggest what appears to be the best choice." (*People v. Warfel* (1979), 67 Ill. App. 3d 620, 627, 385 N.E.2d 175, 180.) Here, the trial judge advised defendant of his right to election and informed him that he would be sentenced under the old sentencing act if he refused to make election. The court then explained the differences in the acts and, when defendant refused to choose, the court sentenced him under the old act. Under these circumstances, defendant's refusal to make an election constituted a waiver of that statutory right.

(2)

Defendant also contends that the sentence imposed upon him was excessive and penalized him for exercising his right to trial. Defendant argues that since the trial court during a plea negotiation conference offered defendant alternative choices of a six-year prison sentence under the new sentencing code or five to eight years under the old code, the court's sentence of 13 to 24 years was an abuse of discretion. We disagree.

The imposition of a sentence is within the sound discretion of the trial court, and, absent an abuse of that discretion, a court of review has no authority to modify the sentence. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The mere fact that a defendant may be given a greater sentence than that discussed at a pretrial or prehearing conference does not support the inference that the heavier sentence was imposed as a punishment for demanding trial. *People v. Busch* (1973), 15 Ill. App. 3d 905, 305 N.E.2d 372.

■■ The record here reveals that the trial court exercised its discretion by imposing the 13 to 24 year prison sentence. The trial judge specifically stated that the lighter sentences offered at the pretrial conference were offered in exchange for defendant's guilty plea to the charge of robbery since the court was uncertain whether the facts disclosed during the conference would support an armed robbery conviction. At the time of

this offer, the trial court resolved the uncertainty in favor of defendant. The evidence at trial, however, established that defendant committed armed robbery, not robbery, and the trial court accordingly imposed a greater sentence for the more serious class I felony (Ill. Rev. Stat. 1975, ch. 38, par. 18—2(b)). We believe that the trial court articulated sound reasons for the sentence imposed and conclude that the court's exercise of discretion was proper.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.